UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON STRICKLAND, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | *  Civil Action No. 16-cv-11364-ADB |
| | * |
| COLETTE GOGUEN, | * |
| | * |
| Respondent. | * |

## **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On November 26, 2008, Petitioner Jason Strickland ("Strickland" or "Petitioner") was convicted of numerous counts related to his alleged assault of Haleigh Poutre, his minor stepdaughter, including assault and battery causing substantial bodily injury ("Count One"), assault and battery causing bodily injury ("Count Two"), two counts of assault and battery by means of a dangerous weapon, including a bat and wand or tube ("Count Three and Five"), and assault and battery ("Count Six"). [Supplemental Answer ("S.A.") at 151–56]. Presently before this Court is Strickland's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [ECF No. 1]. Strickland challenges his convictions, claiming (i) the state court violated his right to present a full defense by excluding medical records and testimony of Haleigh's treatment providers and (ii) ineffective assistance of counsel for failure to consult or obtain a child abuse expert witness on Munchausen Syndrome by proxy ("MSBP"). [ECF No. 1 at 5, 7]. Having reviewed the parties' submissions, the petition for a writ of habeas corpus is DENIED.

## I.   FACTUAL BACKGROUND

In reviewing a habeas petition from an individual in custody pursuant to the judgment of a state court, federal courts are required to presume that factual determinations made by the state

1

courts are correct and "can be rebutted only by clear and convincing evidence to the contrary." 28 U.S.C. § 2254(e)(1); Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (quoting Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002)).

On July 24, 2006, a Hampden County grand jury indicted Strickland on six counts of assault and battery and trial began on October 29, 2008.[1] [S.A. at 85–86, 119–24]. The Massachusetts Appeals Court ("Appeals Court") provided an account of the facts as the jury could have found them, which is reproduced in relevant part below.

> On Sunday, September 11, 2005, at about 2:45 P.M., eleven-year-old Haleigh was brought to the emergency room at Noble Hospital by her mother, Holli Strickland ["Holli"], and Holli's uncle, Brian Young. Haleigh was unconscious and unresponsive, her vital signs were very poor, and she was barely breathing. The back of her head was bleeding and so badly damaged that medical personnel described it as "boggy," i.e., swollen due to blood filling the scalp tissue. "Huge" burns were observed on her chest, and her face was bloody, bruised, and "distorted." A "CT scan" of her brain was taken, as were photographs of her body. Haleigh was transferred to the pediatric intensive care unit at Baystate Medical Center at about 5 P.M. that day. The admitting nurse testified that Haleigh's body core temperature was just eighty-one degrees, her pupils were "fixed," and she was "posturing" her limbs, signaling a traumatic brain injury. A second CT scan was performed at 7:30 P.M., and an "MRI" scan was completed the next morning. Haleigh's body was covered with other injuries of varying age . . . .
>
> . . .
>
> At the time of the injuries, Haleigh was living in the family home with her stepfather, [Strickland]; her aunt and adoptive mother, Holli; Haleigh's sister, [Samantha Poutre], who was nine years old in 2005; and Haleigh's brother, who was two years old in 2005. After being alerted to Haleigh's injuries, the police searched her home and noticed holes, indentations, and small brown blood stains on the walls of the stairway leading to the basement. Blood stains were also located on three walls of the basement playroom area, as well as in the first-floor bathroom. The blood stains on the walls of the basement stairway and in the bathroom were swabbed, tested, and determined to match Haleigh's blood.

---

[1] Holli and Strickland were both arrested for child abuse, but after being released on bail and before any indictment, Holli Strickland was found dead along with her adoptive mother, as a result of an apparent murder-suicide. Commonwealth v. Strickland, 23 N.E.3d 135, 138 n.1 (Mass. App. Ct. 2015).

Commonwealth v. Strickland, 23 N.E.3d 135, 139–40 (Mass. App. Ct. 2015).

The government presented medical expert testimony which the Appeals Court described as follows:

> Dr. Richard Hicks ["Dr. Hicks"] reviewed Haleigh's scans, and opined at trial that Haleigh had suffered severe injuries to the brain, of the type "ordinarily . . . associated with high velocity motor vehicle accidents." Dr. Hicks explained that such injuries would have rendered Haleigh unconscious immediately and that based on the MRI and CT scans, he placed the brain injuries as having occurred at about 4 P.M. on Saturday, September 10, 2005, the day before Haleigh was first brought to the hospital. Dr. Hicks opined that a simple fall down the stairs would not have the force necessary to cause these injuries in a child.
>
> Another trial expert, Dr. Christine Barron ["Dr. Barron"], corroborated Dr. Hicks's testimony, stating that for the injuries to Haleigh's brain to have resulted from a staircase fall, it "would have to be a fall down the stairs with significant external forces, such as a [strong] push or a kick of the child at the top of the stairs." Dr. Barron estimated that Haleigh had sustained the severe head injuries some twelve to twenty-four hours before the Noble Hospital staff took the photographs. Dr. Barron also proffered her opinion as to the nature and manner of infliction of Haleigh's multiple other injuries.[2] She stated that the red bruises on the child's body were consistent with blunt force trauma, also inflicted twelve to twenty-four hours before the pictures were taken. Dr. Barron specifically identified two injuries that in her opinion could not be self-inflicted: a linear scar that ran from Haleigh's right ribcage, across her torso, and behind her hip; and a dry contact burn to her chest. Dr. Barron further testified that she could not give an opinion that any of the injuries were self-inflicted. Dr. Barron opined that the multiple injuries and scars occurred at different times, some having occurred within the twenty-four hours preceding her hospitalization, while others were at least one week old; she could not date some injuries.

Id.

---

[2] In footnote three the Appeals Court stated, "Dr. Barron's description of Haleigh's multiple other injuries covers almost one hundred pages of transcript. Dr. Barron identified multiple lacerations, linear abrasions, scars, and bruises on Haleigh's trunk and legs. Haleigh had cigarette burns on her left foot and left upper arm. Dr. Barron opined that the burns were not consistent with the appearance of accidental cigarette burns. Dr. Baron also identified "D"-shaped injuries, consistent with Haleigh having been struck with a hard, solid object. Haleigh also had a large, curvilinear "C"-shaped laceration and identically shaped bruising on her buttocks. Dr. Barron also testified that Haleigh had restraint injuries on her leg and left wrist."

Further, Haleigh's sister, a minor, testified at trial that she had seen her mother and Strickland beat Haleigh on a number of occasions.

> At trial, Haleigh's sister was twelve. She testified that she had seen Holli and [Strickland] hit Haleigh with their hands, a belt, and a baseball bat, and that she saw scabs and bruises all over Haleigh, with whom she shared a bedroom. Haleigh's sister also recounted how Holli and [Strickland] would push Haleigh down the basement stairs to punish her and how [Strickland] began pushing Haleigh down the stairs shortly after he moved into the home, around 2002.
>
> Haleigh's sister testified that after her soccer game on Saturday, September 10, 2005, she saw [Strickland] push Haleigh down the basement stairs and that this time Haleigh did not "wake up." Haleigh's sister heard [Strickland] order Haleigh to get up and then saw both Holli and [Strickland] shaking Haleigh to awaken her, but she remained on her back at the bottom of the stairs. Haleigh's sister saw [Strickland] carry Haleigh upstairs and place her in the bathtub in the first-floor bathroom.[3] Haleigh's sister added that a little later she saw [Strickland] carry Haleigh up to bed. Haleigh was not awake.
>
> That evening Holli told a friend, a certified home health aide, that Haleigh was ill and that she had stayed home with Haleigh while [Strickland] went to the mall with Haleigh's sister and brother. Holli declined the home health aide's offer to come over and take a look at Haleigh.[4] The next morning, Holli again spoke to her friend and told her that Haleigh was still sleeping and then called a pediatrician at about 10:30 A.M. The doctor on call who returned the message was not Haleigh's regular pediatrician. She testified that Holli reported that Haleigh had the stomach flu and had vomited twice; she offered to see Haleigh in one hour, but Holli declined the appointment.
>
> The family had another soccer game to attend that afternoon, and because Haleigh was still "asleep," Holli asked Alicia Weiss ["Weiss"], her neighbor and close friend, to watch Haleigh. Weiss arrived after noon, and the family left at about 12:30 P.M., leaving Weiss alone with Haleigh. Weiss testified that she checked on Haleigh three times. She saw some foam on Haleigh's mouth and testified that Haleigh neither moved nor woke up. The family returned at about 2:30 P.M., accompanied by . . . [Holli's uncle Brian] Young. At Holli's urging, Young checked on Haleigh and immediately realized something was very wrong;

---

[3] In footnote four the Appeals Court stated, "This testimony was corroborated by forensic evidence indicating that blood found in and around the bathtub and on the walls of the basement stairway matched Haleigh's deoxyribonucleic acid (DNA) profile."

[4] In footnote five the Appeals Court stated, "[Strickland] testified that he came home at approximately 9 P.M. and saw Haleigh sleeping at approximately 10:30 P.M."

4

he carried her downstairs and brought her to Noble Hospital.

Id. at 140–41.

The sister's account was corroborated by other eyewitness testimony concerning additional instances in which Strickland had beaten or otherwise abused Haleigh.

> At trial, the Commonwealth introduced other eyewitness accounts of [Strickland] abusing Haleigh, including incidents in which [Strickland] (1) struck Haleigh in the hand with a plastic tubular wand; (2) aided Holli in interrogating Haleigh as Holli beat her lower legs with a bat; (3) dragged Haleigh into the house by her ear, causing her to cry; (4) together with Holli took Haleigh into the bathroom, after which a muffled cry was heard and Haleigh emerged with a bloody lip; and (5) struck her in the head with his hand.[5]

Id. at 141.

For its part, the defense called a number of witnesses, including a mental health professional, who testified concerning Haleigh's mental health issues and previous instances of reckless behavior and purposeful self-harm.

> The defense called a treating health professional, . . . Pamela Krzyzek ["Dr. Krzyzek"], who testified that when she came to the family's home, [Strickland] was not present because he was at work.[6] [Dr.] Krzyzek testified that Haleigh told her she heard voices telling her to hurt herself and that she had hit her knees with a hammer. She also testified that [Strickland] did not report Haleigh's injuries to her, but that it was always Holli who did. The defense also called Stephanie Trent Adams ("Adams"), whose children had attended Holli's daycare . . . . Adams testified that [Strickland] worked during the day . . . . Adams also recalled that she had seen Haleigh 'stair-surfing,' punching herself, and hitting her head against the wall of a cubby.

Id.

---

[5] In footnote six the Appeals Court stated, "The primary sources of these other accounts of abuse were Weiss and Angela Harris, a friend of Haleigh's sister."

[6] In footnote seven the Appeals Court stated, "[Dr.] Krzyek was a clinical case coordinator working for an organization that provided voluntary assistance to families designed to stabilize a child's behavior transitioning from a hospital stay to home. In this case, [Dr.] Krzyzek received a referral to assist with Haleigh's transition to home after a stay at a hospital for an eating disorder. She saw Haleigh in the home approximately once per week from July, 2004, to September 7, 2005."

5

The defense also called its own expert witnesses, who testified that Haleigh's brain injury could have been caused by a less traumatic event than the government's experts described and that, based on DNA evidence, Strickland was excluded as a potential source.

> Defense counsel called two expert witnesses. Dr. Jonathan Arden ["Dr. Arden"] testified that the kind of brain injury Haleigh suffered did not require the equivalent of a high speed car crash in order to cause it . . . . Arden gave an opinion that the head injury could have occurred between two or three hours and twenty-four hours before the 4 P.M. CT scan was taken on Sunday . . . . The other expert witness, Dr. Brian Wraxall ["Dr. Wraxall"], testified that he had examined the DNA taken from the Strickland home, and that [Strickland] was excluded as a potential source of that DNA.

Id.

Strickland took the stand in his own defense and "testified that he believed Holli when she told him that Haleigh was injuring herself . . . ." Id. at 141–42. He claimed that Holli would take Haleigh to all of her medical appointments and that he only learned of Haleigh's injuries through Holli. Id.

> The defense also attempted to discredit both Weiss and Haleigh's sister with prior inconsistent statements. For example, Haleigh's sister did not reveal that she had seen [Strickland] push Haleigh down the stairs on Saturday, September 10, until more than two years after the incident. In the interviews immediately after Haleigh was hospitalized, Haleigh's sister had claimed that she saw Haleigh hit her head on the floor in the basement while performing a back flip on Friday night and that as a result Haleigh briefly lost consciousness. For her part, Weiss initially told police that Holli was a good mother and volunteered that "[i]t's not like Holli would ever throw her kids down the stairs or, like, hit them," but Weiss testified at trial that she had "left out certain things" in an effort to "protect[ ] [her] best friend."

Id. at 142.

Strickland tried to introduce the testimony of Dr. Rukmini Kenia ("Dr. Kenia"), Haleigh's pediatrician, and Susan Malloy ("Malloy"), her nurse practitioner (collectively "medical providers"), to establish Strickland's "defense to the count charging multiple injuries inflicted on or before September 11, 2005." Id. Strickland's counsel sought to establish that Dr.

6

Kenia and Malloy "saw Haleigh on numerous occasions, observed bruises and burns on her, and were treating her for self-abuse." Id. The Appeals Court found that "the trial judge did not admit the medical provider evidence to corroborate the defendant's own beliefs" that Haleigh was abusing herself because Strickland "never spoke to Dr. Kenia or Malloy" and "the evidence was being offered for the impermissible purpose of corroborating Holli's and Haleigh's hearsay statements." Id. at 143.

On November 26, 2008, the jury found Strickland guilty on five of the six counts.[7] [S.A. at 109].

## II. PROCEDURAL BACKGROUND

Following his conviction, on December 18, 2008, Strickland appealed. [S.A. at 110, 161]. Thereafter, on August 9, 2012, he filed a motion for a new trial on two grounds: (i) newly discovered evidence and (ii) ineffective assistance of counsel. [Id. at 116, 295, 299, 304]. In support of the new trial motion, Strickland proffered two reports from a doctor and a social worker who opined that Holli presented a case of MSBP and could have deceived medical providers into believing that Haleigh's injuries were the result of self-harm. [Id. at 52–53, 149]. Strickland's attorneys had not presented evidence on MSBP at trial, which Strickland contended would have supported his argument that Holli was able to conceal the source of Haleigh's injuries from other concerned adults and that he had been deceived. [Id.]. The Superior Court denied Strickland's motion. The court determined that Strickland had "failed to show that the proffered 'expert' opinion was unavailable at the time of the trial" and that his counsel's failure to procure evidence on MSBP was not ineffective assistance because "the additional expert

---

[7] Strickland was found not guilty of assault and battery with a dangerous weapon, use of a shod foot. [S.A. at 17, 109, 154].

7

testimony on MSBP would not have achieved anything material for the defense." [Id. at 396–401].

On April 1, 2013, the Appeals Court consolidated Strickland's direct appeal with the appeal of the denial of the motion for a new trial. [Id. at 117]. On January 23, 2015, the Appeals Court affirmed the convictions and the denial of the motion for a new trial. Strickland, 23 N.E.3d at 150. In so holding, the Appeals Court concluded that while the medical providers' evidence about Haleigh's self-abuse was sufficiently relevant and corroborative to be admissible in the judge's discretion, the exclusion did not prejudice Strickland's case. Id. at 144–45. Further, neither of the proffered reports demonstrated that Holli could have successfully deceived Strickland because he was not similarly situated to the medical professionals who might have been deceived. Id. The court also concluded that Strickland had not demonstrated that his trial counsel was ineffective. Id. at 149–50.

On April 16, 2015, the Supreme Judicial Court denied Strickland's application for further appellate review. [S.A. at 6]. Strickland now seeks habeas relief from this Court pursuant to 28 U.S.C. § 2254.

## III. LEGAL STANDARD

A federal court's review of a state criminal conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2254. The AEDPA prohibits a federal court from granting habeas relief to a state prisoner if the prisoner has not exhausted his federal constitutional claims in state court. 28 U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Because the Supreme Judicial Court declined to hear his case, Strickland has exhausted his available state remedies.

Strickland now presents the same arguments that were considered by the state superior

and appellate courts, so his arguments were considered on the merits. "When a federal claim has been presented to a state court and the state court has denied relief," the federal court may assume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011).

The Court must therefore afford "substantial deference" to the state court and may only grant habeas relief if the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2); Jackson v. Marshall, 864 F.3d 1, 9 (1st Cir. 2017).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court arrives at a conclusion contrary to that reached by the Supreme Court on a question of law or if the court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court unreasonably applies federal law when it "correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply." Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009). An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (citation omitted). A petitioner must show that the state court decision applied clearly established law in a way that was "objectively unreasonable."

9

Sanchez, 753 F.3d at 299 (quoting White v. Woodall, 572 U.S. 415, 419 (2014)) (internal quotation marks omitted).

A state court judgment is based on an unreasonable determination of the facts if the decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). "The petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). In conducting a habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241).

## IV. DISCUSSION

### A. Ground One: Exclusion of Medical Evidence Violated Strickland's Sixth and Fourteenth Amendment Right to Present a Full Defense

Strickland claims that the exclusion of the medical providers' testimony and records that Haleigh was being treated for intentionally self-inflicted injuries violated his Sixth and Fourteenth Amendment right to present a full defense. [ECF No. 1 at 5; ECF No. 19 at 28]. Specifically, Strickland claims that this medical testimony was directly related to what he knew or reasonably could have known about the physical abuse of Haleigh around or before September 10, 2005, and also relevant to the jury's assessment of his repeated denials that he hit or abused Haleigh with a wand, bat, or in any other way. [ECF No. 19 at 31].

Though "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)), a "defendant's right to present relevant evidence is subject to reasonable restrictions . . . to accommodate other legitimate interests in the criminal trial process." United States v. Scheffer, 523 U.S. 303, 308 (1998) (citations and internal

10

quotation marks omitted).  Reasonable restrictions include the state's "legitimate interest in ensuring that reliable evidence is presented."  DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) (quoting Scheffer, 523 U.S. at 308).

Federal and state governments have broad latitude to "establish rules excluding evidence from criminal trials."  Scheffer, 523 U.S. at 308.  Such rules do "not abridge an accused's right to present a defense" so long as the rules are "not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  Id. (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).  The exclusion of evidence is "unconstitutionally arbitrary or disproportionate . . . where it has infringed upon a weighty interest of the accused."  Id.  The most recent Supreme Court precedent, as understood by the First Circuit, suggests that state evidentiary decisions will be found to violate a petitioner's constitutional rights only in "egregious situations."  Dibenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) (citing Fortini v. Murphy, 257 F.3d 39, 46 (1st Cir. 2001)).  The First Circuit has seemed reluctant to expand the doctrine beyond those exceptional cases.  Id.

"[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Holmes v. South Carolina, 547 U.S. 319, 326 (citing Fed. R. Evid. 403).  Trial judges are permitted "to exclude evidence that is repetitive[,]" "only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues."  Crane, 476 U.S. at 689–90 (citation and internal quotation marks omitted).

To satisfy the habeas standard, a habeas petitioner must not only demonstrate a constitutional violation, but must also show that the violation had a "substantial and injurious effect or influence in determining the jury's verdict."  See Fry v. Pliler, 551 U.S. 112, 116 (2007)

(quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)); see also Lucien v. Spencer, 871 F.3d 117, 122 (1st Cir. 2017). In determining if the Brecht standard has been met, the Court considers "(1) the extent to which the error permeated the proceeding, (2) the centrality of the issue affected by the error to the case as actually tried and (3) the relative strength of the properly admitted evidence of guilt." Sinnott v. Duval, 139 F.3d 12, 18 (1st Cir. 1998).

Here, the excluded medical provider testimony and records did not infringe on Strickland's right to present a full defense because the evidence was largely cumulative and of limited probative value, and in any event, the exclusion did not prejudice Strickland's defense. The proposed medical testimony was offered to corroborate Strickland's testimony that he believed Holli when she told him that Haleigh was being properly treated for self-abuse by medical providers. [ECF No. 21-17 at 225–27]; see Strickland, 23 N.E.3d. at 142–43. The evidence was therefore not directly exculpatory, but merely had the potential to affect the way in which the jury weighed Strickland's testimony. Further, by cross-examining Dr. Barron, Strickland's trial counsel effectively introduced portions of the excluded evidence by eliciting testimony that Dr. Barron reviewed medical records from Drs. Kenia and Malloy that indicated that some of the injuries were in fact self-inflicted. See Strickland, 23 N.E.3d at 145. Finally, the potentially mitigating effect of the medical testimony must be considered in the context of the totality of the evidence submitted, including multiple eyewitness accounts corroborating Haleigh's sister's claim that Strickland abused Haleigh on multiple occasions.

Given the other evidence in this case, the exclusion of this testimony and medical records did not infringe on Strickland's right to present a full defense or have a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 623; see also Crane, 476 U.S. at 689–90.

### B. Ground Two: Failure of Counsel to Obtain an Expert Witness on Child Abuse and MSBP and Sixth Amendment Right to Effective Counsel

As a second ground for relief, Strickland claims that his trial counsel was constitutionally ineffective for failing to obtain an expert witness on child abuse and MSBP. [ECF No. 1 at 7]. Strickland argues that the testimony of a child abuse and MSBP expert would have been relevant to the jury's assessment of his credibility and culpability and could have informed the jury that (i) Holli suffered from MSBP, (ii) Holli's MSBP led her to abuse Haleigh and deceive others concerning that abuse, and (iii) fathers in MSBP families are typically ignorant of the child abuse, all of which would have corroborated his testimony that he did not abuse Haleigh or know that abuse was occurring. [ECF No. 19 at 43].

Trial counsel is ineffective, such that his performance violates a client's Sixth Amendment right to counsel, if (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "deficiencies in counsel's performance [were] prejudicial to the defense." Strickland v. Washington, 466 U.S. 668, 688, 692 (1984). The standard is broadly deferential to the strategic and tactical decisions of trial counsel, making them "virtually unchallengeable." 466 U.S. at 689–90. The defense "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Wright v. Marshall, 656 F.3d 102, 108 (1st Cir. 2011) (quoting Strickland, 466 U.S. at 690). Counsel's performance is constitutionally deficient "only if no competent attorney would have acted as [counsel] did." Companonio v. O'Brien, 672 F.3d 101, 110 (1st Cir. 2012) (citation omitted).

Even if a lawyer's performance is constitutionally unacceptable, habeas relief will only be granted if, "but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Sleeper v. Spencer, 510 F.3d 32, 39 (1st

Cir. 2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Because Strickland's claim was adjudicated on the merits, however, he also must satisfy the deferential standard established by the AEDPA. Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009). Therefore, "to establish constitutionally ineffective assistance of counsel as a ground for federal habeas relief, the petitioner bears a doubly heavy burden" because the petitioner must contend with both the deferential Strickland standard and the deferential standard required by § 2254. Id.

Strickland has not demonstrated that his trial counsel's failure to consult with or procure an expert witness on MSBP constituted constitutionally deficient performance under the Strickland standard. Strickland's counsel investigated the case by consulting with social workers at the Department of Children and Families, Haleigh's medical providers, Haleigh's family, expert witnesses, and state and local law enforcement investigators. [ECF Nos. 21-16, 7, 51, 63, 71, 74, 134, 164]. After sufficient pre-trial investigation, Strickland's attorney presented evidence that Strickland did not know of the abuse and offered other plausible theories about the source of Haleigh's injuries such as self-abuse or abuse by others. "If counsel conducts such substantial investigations, the strategic choices made as a result 'will seldom if ever' be found wanting." Strickland, 466 U.S. at 681.

The opinions proffered to the Appeals Court were prepared for civil litigation and reflect post-mortem analysis of a possible diagnosis. See [S.A. at 913–14]. Further, the opinions assert only that medical providers, not Strickland, were deceived by Holli, and it is doubtful that a jury would have accorded such evidence any weight, particularly given the eyewitness testimony of Strickland's repeated participation in the abuse. Strickland has not demonstrated that, but for his attorney not soliciting these reports, the jury would have believed that he had no part in

Haleigh's abuse.  In applying the highly deferential <u>Strickland</u> standard, this Court agrees with the Appeals Court that Strickland has failed to demonstrate, under the AEDPA, that his defense counsel was unconstitutionally ineffective.

## V. CONCLUSION

For the foregoing reasons, Strickland's petition for a writ of habeas corpus is <u>DENIED</u>.

**SO ORDERED.**

September 25, 2019 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE